UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **REDACTED TRANSCRIPT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:20-cr-00112-JMS-KMB |
| | ) | Indianapolis, Indiana |
| TONY CUSHINGBERRY (01), | ) | Wednesday, May 31, 2023 |
| A/K/A TONY CUSHINGBERRY-MAYS, | ) | 1:00 o'clock p.m. |
| | ) | |
| Defendant. | ) | |

Before the
HONORABLE JANE MAGNUS-STINSON

TRANSCRIPT OF SENTENCING HEARING

APPEARANCES:

FOR THE GOVERNMENT:     United States Attorney's Office
                        By:  Peter A. Blackett and
                        Jayson W. McGrath
                        10 West Market Street, Suite 2100
                        Indianapolis, Indiana 46204

FOR THE DEFENDANT:      Indiana Federal Community Defenders
                        By:  Joseph Martin Cleary
                        Dominic David Martin and
                        Sara Varner
                        111 Monument Circle, Suite 3200
                        Indianapolis, Indiana 46204

ALSO PRESENT:           The Defendant in person.

COURT REPORTER:         Jean A. Knepley, RDR, CRR, CRC, FCRR
                        46 East Ohio Street, Room 301
                        Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

1                    *(In open court.)*

2              THE COURT:  We are here under Cause No. 1:20-cr-112.

3    This is the case of the United States v. Tony Cushingberry.

4    Mr. Cushingberry is present in person with counsel, Ms. Varner,

5    Mr. Martin, Mr. Cleary.  The Government is present by Assistant

6    United States Attorneys Peter Blackett, Jayson McGrath, and

7    Joseph De St Jean from the United States Postal Service.  There

8    he is in the center.  Okay.  The Court has been assisted by

9    probation officer Ryan Harrold, who prepared the presentence

10   report; and our court reporter is Jean Knepley.

11             So this matter is before the Court for sentencing.

12   Previously Mr. Cushingberry pled guilty, and the Court accepted

13   that plea just a little under a year ago.  Does your client

14   wish to proceed with sentencing, Ms. Varner?

15             MS. VARNER:  Yes, Your Honor.

16             THE COURT:  All right.  Is the Government prepared to

17   proceed?

18             MR. McGRATH:  Yes, Your Honor.

19             THE COURT:  All right.  So the Court has reviewed

20   before today's proceeding the following documents:  The

21   presentence report that was prepared in final form at

22   Docket 79, and I note that that has been of record since August

23   of last year.  Does your client — did your client receive it

24   more than 35 days before today's date, Ms. Varner?

25             MS. VARNER:  Yes, Your Honor.

1          THE COURT:  All right.

2          And the court has reviewed the following documents in

3  advance of hearing -- of the hearing today:  The victim impact

4  statements submitted by the Government at Docket 89 are what

5  the Court would consider the actual victim impact statements

6  from the family of the decedent.  And then, dozens of letters

7  were submitted by the Government, mostly from the U.S. postal

8  community concerning the matter before the Court at this time.

9          Defendants submitted sentencing memorandum at

10 Docket 95, which the Court has reviewed.  In addition to that

11 memorandum and in support of that memorandum, the Defense also

12 submitted a U.S.B. with a video presentation that the Court has

13 reviewed.

14         The Court reviewed the memorandum in support of

15 sentencing submitted by the Defense at Docket 98, and then,

16 responsive to an argument raised by the Government, the Defense

17 submitted last night submission in support of sentencing at

18 Docket 108, which I have also reviewed.

19         The Government's sentencing memorandum, in addition to

20 the victim impact statements, was submitted at Docket 102, and

21 the Court reviewed that document as well.

22         Are there any other documents for the Court to

23 consider, Mr. McGrath?

24         MR. McGRATH:  No, Your Honor.

25         THE COURT:  Ms. Varner?

1      MS. VARNER:  No, Your Honor.

2      THE COURT:  All right.  Ms. Varner, have you and Mr.

3  Cushingberry read and discussed the presentence report?

4      MS. VARNER:  We have, Your Honor.

5      THE COURT:  Is it accurate?

6      MS. VARNER:  It is.

7      THE COURT:  Are there any objections?

8      MS. VARNER:  None.

9      THE COURT:  Are there any for the Government?

10      MR. McGRATH:  No objections, Judge.

11      THE COURT:  I should note, and I believe staff

12  notified counsel this morning, referenced in the presentence

13  report is an incident from Clark County, and the Court reviewed

14  the probable cause affidavits, as well as photos and a video

15  from that incident.  And counsel were so advised; is that

16  correct, Mr. McGrath?

17      MR. McGRATH:  That's correct, Judge.

18      THE COURT:  And Ms. Varner?

19      MS. VARNER:  Yes, Your Honor.

20      THE COURT:  Thank you.

21      So there are no objections to the PSR, and I want to

22  direct everyone's attention to the conditions of supervision

23  contained in the PSR.  They are found at Paragraphs 63 and 64.

24  These will be the rules of supervision that would govern Mr.

25  Cushingberry if he is placed on supervised release.

1     Ms. Varner, have you and Mr. Cushingberry carefully

2  reviewed these conditions?

3     MS. VARNER:  We have, Your Honor.

4     THE COURT:  Do you have any objections to them?

5     MS. VARNER:  We do not.

6     THE COURT:  Are there any objections for the

7  Government, Mr. McGrath?

8     MR. McGRATH:  No, Your Honor.

9     THE COURT:  All right.  Mr. Cushingberry, do you agree

10  that you have reviewed these proposed conditions?

11     THE DEFENDANT:  Yes, ma'am.

12     THE COURT:  All right.  And the probation officer has

13  included the reasons why he is recommending these conditions.

14  I agree with him, that these conditions are appropriate for you

15  and that his reasoning is sound.  Do you believe you understand

16  them?

17     THE DEFENDANT:  Yes, ma'am.

18     THE COURT:  You have the right to have me read each of

19  them to you as I pronounce sentence, or if you believe you

20  understand them and why they are being imposed, you can waive

21  that right.  Do you wish for me to read the conditions when I

22  pronounce sentence?

23     THE DEFENDANT:  No, ma'am.

24     THE COURT:  I will accept your waiver of the formal

25  reading and will also tell you, Mr. Cushingberry, these

1    conditions will be included in writing in the judgment that

2    will be issued by the Court.  So you will always have a written

3    copy of them, all right?

4              THE DEFENDANT:  Okay.

5              THE COURT:  The Court will also accept the presentence

6    report as its findings of fact, accepting the report for the

7    record under seal.  In the event of any appeal, counsel will

8    have access to the sealed report but not to the recommendation

9    portion, which shall remain confidential.

10             Within the presentence report, if we all, then, could

11   turn to the guideline calculation.  It begins on page 6 at

12   Paragraph 16.  For the charge of murder in the second degree

13   and protection of an employee of the United States, the base

14   offense level is 38.

15             In Paragraph 18 there is a six level victim-related

16   adjustment, given the employment of the victim as a United

17   States postal letter carrier.  So the adjusted offense level is

18   44.  The Defendant has clearly demonstrated acceptance of

19   responsibility by pleading guilty, so the offense level is

20   decreased by two levels.  And upon motion of the Government,

21   because the Defendant pled guilty in a timely way, a third

22   level would be reduced.

23             Is the Government making that motion?

24             MR. McGRATH:  Yes, Judge.

25             THE COURT:  All right.  So that third level will be

1    taken off, which will result in a total offense level of 41.

2         The second half of the guideline calculation is based

3    on Mr. Cushingberry's criminal history; he has none.  His total

4    criminal history score is 0.  That places him in criminal

5    history category I.  So at a level 41-I, the guideline range is

6    as follows:  A term of imprisonment of 324 to 405 months,

7    supervised release of two to five years, a fine of 50,000 to

8    $250,000, and a special assessment of $100.

9         Counsel, do you agree that is the correct calculation,

10   Mr. McGrath?

11        MR. McGRATH:  Yes, Your Honor.

12        THE COURT:  And Ms. Varner?

13        MS. VARNER:  Yes, Your Honor.

14        THE COURT:  All right.  The Court will adopt that,

15   then, as its guideline calculation.

16        My understanding, Mr. McGrath, is that there is a

17   witness who wishes to be heard from the Government's side?

18        MR. McGRATH:  That's correct, Judge.

19        THE COURT:  I always find it — I think it is more

20   appropriate if the Defendant's opportunity for allocution

21   follows that, so consideration of that statement can be

22   included.

23        MR. McGRATH:  I understand, Your Honor.

24        THE COURT:  All right, thank you.  So —

25        MR. McGRATH:  Your Honor, I have just been informed

1   that there has been a change.

2          THE COURT:  Okay.

3          MR. McGRATH:  We were going to call ██████████

4   to the stand, and she was essentially going to read her victim

5   impact statement.  I have been asked to read that into the

6   record, and I would beg the Court's indulgence for that at this

7   time.

8          THE COURT:  Go ahead.

9          MR. McGRATH:  Thank you.  This is the letter from

10  ██████████  filed at Docket 89-2, and this is Miss Davis in

11  the purple shirt next to Miss Lloyd.

12         THE COURT:  Thank you.

13         MR. McGRATH:  I have been unsure how to express

14  myself, but I think Angie would appreciate cutting straight to

15  the main point.  I watched our daughter, KD, utterly implode

16  when my brother called me and asked if the coroner had gotten

17  ahold of me yet.  A girl of dreams and open possibilities and

18  deep compassion who had been overcoming a life of medical

19  issues, a teen who was looking at becoming a mental health

20  professional or maybe a mathematician or some career related to

21  law, a smart mouthed and vexingly honest child was lost in that

22  moment.  Our baby, who we nursed through three major spinal

23  surgeries who was supposed to die by age nine due to her

24  condition but survived beyond the experienced neurosurgeon's

25  most brazen hopes, our miracle child in so many ways, was

1  gunned down as thoughtlessly as Angie was.

2          I held her through her screams of sorrow and fear as

3  we both sobbed for hours and all the days afterward when the

4  realizations hit and the blessedly protective numbness faded

5  into raw realities and every time she didn't get the expected

6  texts or calls.  I watched her withdraw into an icy darkness,

7  not wanting to interact with one more person and perform her

8  sorrow in ways they expected her to.  She wanted to grieve in

9  private —

10         THE COURT:  Go ahead.

11         MR. McGRATH:  — but the circumstances did not allow

12  that.  We had three services for her to accommodate all the

13  people who wanted to pay their respects.  Two were mostly for

14  show with empty rented coffins because we'd buried Ang during

15  the first one held for friends and family.  KD sat at them all

16  and thanked people for coming and smiled, nodding as they

17  poured forth their condolences and prayers and recounted their

18  happiest memories of Angela.

19         In the times between the work of memorialization and

20  beginning the awful logistics of packing away the detritus of a

21  dead parent's life, recounting having just been there in that

22  space with Angela and cleaning the dishes she left in the sink

23  from the morning she was killed, KD read news articles that

24  popped up across the country and outside it in newspapers and

25  social media.

Most articles were benign or sympathetic, but she also read the comments, some blaming Angie, some blaming race, and some blaming the dogs that caused her to have to stop delivering the mail in the first place.  On top of the surreal situation, doing the hard work of packing away things and emotions, being preternaturally strong in the face of it all and navigating the emerging COVID threat, KD was being traumatized over and over by mischaracterizations of Angela and all the absolute worst that disconnected people can say in the face of a tragedy.

She shut down after the memorial motorcycle ride.  Her easy laughter and smile were gone.  She didn't reach out to even her closest friends.  For a whole year she occupied the sofa, sometimes watching TV, sometimes reading, only occasionally eating, and Skyrim, the video game she had begun playing at Angela's made decreasing appearances.

She stopped going to therapy and didn't stick with schoolwork when virtual learning came on the next year.  The next year she took a couple months off for mental health days. This year she caught COVID and had what I hope is her final surgery to realign her partially paralyzed leg.  There was no cushion for the unfortunate disruptions, and we were told in November that she would have to withdraw from school and get her equivalency diploma.

In December we signed a paper, and KD is no longer a

student and far short of her goals.  I am just glad she is still here, but she feels the seeming finality of an education ripped away as well.

Angela was gone, but KD became the ghost, and much of the time she still is.  So many people have been trying to help, and she has a great network of people on her side encouraging and supporting her.  That helps.  She has a therapist she sees regularly again, but leaving the house for anything other than school still requires cajoling and promises of fast food.

Her interests in most things she once enjoyed is gone. KD exists.  At 17, now, she has shown no interest in learning to drive or meet up with friends outside of school.  There is one exception.  She did discover Korean dramas and has been teaching herself the language, culture, and history with the goal of traveling there after school.  It is not what I expected, but having spent years in the dark void, any light is welcome.  And her innate compassion is still evident.  Even after losing so much, she still doesn't even want to ask for a life sentence for Angie's murderer.  She doesn't feel it is her place to ask for punishment.

Her own future, being so hard won against the odds from her spinal cord tumor and its grievous physical fallout, as well as growing up in poverty was something she was looking toward with hope, but that was stolen from her by the one

stupid decision made in a milieu of generational trauma, systemic oppression, ignorance, lack of opportunity, poor impulse control, and absent hope for a better future.  I have empathy for Tony Cushingberry.  I heard his life was not the best, but that doesn't justify, excuse, or explain his conscious decision to threaten, intimidate, and attack Angie. His brain still hasn't finished developing, but he knew better than that.

He let himself succumb to the basest of his impulses, and in the seconds of that encounter, he took many lives beyond Angie's, including his own future and that of his now three-year-old son.  Does he get that?  Can he genuinely recognize the lasting and expanding traumas he inflicted?  The plea deal was crafted to remove the mandatory minimum.  It's a calculated tactic to possibly evade a harsher sentence, and that reflects a selfish desire for self-preservation and harm reduction, not the existence of remorse or even scarce evidence of a conscience.

I still don't know what I think would be fair for sentencing, whether it is punitive for the guilty or protective of the public in nature, what the right course would be.  I don't know Mr. Cushingberry to gauge his character, his mental and emotional state, and I cannot look into his future to see how he would make use of his time in incarceration.  He should be grateful, though, that it is not up to me to decide his

1  fate, because I have years of sorrow and rage pent up for what

2  he took, but no punishment can restore what we have lost.

3  Thank you.

4       THE COURT:  So Mr. Cushingberry, you have the

5  opportunity to make a statement.  It is called an allocution,

6  and this is your opportunity.  And now would be the appropriate

7  time to speak on your behalf.  It is no disrespect, but because

8  of the microphone, you can remain seated, okay?

9       THE DEFENDANT:  Okay.

10       THE COURT:  Go ahead, please.

11       THE DEFENDANT:  Your Honor, I appreciate the Court's

12  time and opportunity given to me to speak.  I would —

13       THE COURT:  Let me just say one thing.  I know you are

14  nervous and you are reading, but you need to slow down.  When

15  we read, we speak very quickly.  So I am going to ask you to

16  please make sure you slow down so that everything you say can

17  be both taken down by the Court Reporter and heard by everybody

18  who is here.  All right?

19       THE DEFENDANT:  Okay.

20       THE COURT:  Thank you.

21       THE DEFENDANT:  Your Honor, I appreciate the Court's

22  time and opportunity given to me to speak.  I would like to

23  start by apologizing, but I know that an apology wouldn't be

24  enough to heal the hearts that I have broken or even explain

25  the deepest sorrow I have.  I am truly sorry.

1    I want to apologize to Angela Summers and her family

2    for this nightmare we all have to live and go through with for

3    the rest of our lives.  My heart and prayers go out to

4    Ms. Summers' daughter.  I can't imagine the pain and tears my

5    actions has brought you.  I know it probably won't help or make

6    things better, but I literally go through a lot physically,

7    mentally, and emotionally when I think about you.  I cry, I

8    stress, and on top of that, there will be days I won't even

9    eat.

10   The pain really eats me up on the inside.  Losing a

11   parent, especially a mother, has to be the worst challenge to

12   overcome in life.  My father missed the first 15 years of my

13   life because he committed a crime and was sentenced to prison.

14   His absence plays a big role in my life, but it brung me and my

15   mother closer.  I know it's no comparison because my father is

16   still here, but I struggle today knowing that I took any

17   chances away from you having a relationship with your mother.

18   Reading your letter affected me a lot.  I'm very sorry

19   to hear about your problems at home and at school.  I am sorry

20   that you feel pain when you hear my name, and I hope after

21   today that your life gets easier.

22   I wish I could go back and change everything, but I

23   can't.  All I can do is move forward and try to better myself,

24   which I am already on a good path of doing so.  And I hope you

25   can do the same as well.  I wish I had the words to explain the

deep — I wish I had the words to explain the remorse I really feel for you and your family, but as a man with regrets, the best thing to do would be apologizing.  My heart and prayers go out to you.  I pray for you every night.  I am truly sorry to your family and to the people I hurt and let down.  I hope you can find in your hearts to forgive and accept my apology.

I also want to apologize to the postal workers.  I want to say how sorry I am to you.  I'm so sorry for taking Ms. Summers from you guys' community, and I'm especially sorry to those of you who knew her personally.  Any postal worker should feel safe when they go to work, and I'm sorry my actions made you and your families afraid.

And I want to apologize to everyone for running.  I should have stayed.  I know that made it harder for you, and I'm sorry.

Before this tragedy happened, I never been in trouble a day in my life until I found myself locked up in segregation in Marion County Jail.  My cell was the size of a small closet. I could stick my arms out to the side and touch wall to wall. Not only my cell, but the whole environment was dirty.  There was literally human feces on the walls and bars.  I was locked in my cell 23 hours a day, sometimes 24 hours.  I was isolated and cut off from everyone.

It was literally the worst time of my life but not because of these reasons.  It was the worst time in my life

1  because I couldn't think about anything except what I had done
2  to Ms. Summers, to her daughter, and to Ms. Summers' family and
3  to my family.

4       I thought about it so much I would wake up in cold
5  sweats from nightmares I would have when I would see
6  Ms. Summers in my dreams.  I had to accept and surrender to
7  everything I was going through.  I felt like this was my
8  punishment for what I had done.  When I had first arrived in
9  segregation at Marion County Jail I was walking down the range
10 when a man stuck his arm out through the bars and handed me a
11 Bible.  I never seen or met the man before, but I knew it was a
12 sign from God.

13      I took it into my cell and began to read it.  Not only
14 did I start turning to it, I started to turn to God.  Reading
15 the Bible gave me hope again.  It made me believe things would
16 get better, and I have held on to that hope.  I believe
17 everything happens for a reason, but I don't know why this
18 happened to both of our families.

19      But what this has given me is time to think.  I know
20 this is a beginning of a long journey for me.  It has been the
21 first time I actually been able to really think about my past,
22 and it helped me realize how rough I grew up and many obstacles
23 I overcame.  My entire life revolved around hope.  Me, my
24 mother, and little siblings struggled and lived rough my whole
25 life.

1        We lived hoping that things would get better.  Through
2   all the trials and tribulations we faced growing up, I still
3   tried to step up and be the man of the house and a big brother
4   to my little siblings.  I was the glue to my family since I can
5   remember.  I was always there for them when they needed me.  I
6   really tried to be a helper to my family, to my mom, to my
7   siblings, and friends.  With that being said, Your Honor, my
8   biggest fear today is being seen as this one day.
9        But no matter what happens here today, I am going to
10  continue living with hope, and I'm going to do that by doing
11  things that would help better me and my son's future.  I have
12  already started while being in Clark County Jail by taking
13  classes and programs such as mindfulness program, the WIN
14  program, and parenting class.  Even though this is the
15  beginning, I know this is not the end of my journey.  I want to
16  help kids in the community that grew up similar to what I did
17  and that is also afraid to talk to anyone about it.  I want to
18  be a mentor and counsel the kids in the community into making
19  better choices in life.
20       When I get to prison, I want to take trades and
21  classes that would help me succeed in my future goals I have
22  planned.  With this being said, I believe I should try to get
23  my bachelor's degree.  I really want to continue learning about
24  myself so I can work towards a better future.  I am willing to
25  take classes or programs for healthy thinking or counseling if

it's available.

I plan on taking parenting classes because I want to be the best father I can be for my son.  I also want to try to take a trade, an electrician, or maybe getting my CDL license. I am not going to let this experience turn me into the person everyone thinks I am.  I am determined to make me and my family proud.

Your Honor, I want to end this letter with apologizing to the love of my life, Nikayla.  I am sorry for leaving you to fend for yourself and our son.  I know this is — I know this is not what we had planned in our future, but I am still going to do my best to keep the promise I made you.  And that was to support and be there as much as I can for you and our son no matter what.  You two mean the world to me, and I love you—all so much.

To my one and only son, ████████, I'm sorry for putting our lives on pause.  Since the day you were born my intentions was to never leave your side.  My main motive and focus was to give you a better life and future than I had growing up.  I wanted to be the father to you that I never had growing up, but I am never going to give up on that no matter what happens here today.  I am still going to be the best father as I can be and try to have as much impact and influence on your life as I can.  I want you to know I always have and always will love you and wanted the best for you and your

mother.

And again, to the Summers' family, to Ms. Summers' daughter, and the postal workers, I am really sorry.  And I am living with this and taking full responsibility for it every day.  I hope you can forgive me and accept my apology.  Thank you.

THE COURT:  Thank you, Mr. Cushingberry.

Ms. Varner.

MS. VARNER:  I would like to start today by offering my sincere condolences to Angela Summers and to her colleagues at the post office.  I want you to know that nothing I say here today is meant to diminish your loss in any way or take away from your grief.  From the submissions in this case, it is clear to me that Angela Summers was loved and that she will continue to be missed.  What I am trying to do today is to give the Court and the people in this room the fullest possible picture of who Mr. Cushingberry is, where he came from, and how we got here.

Almost exactly a year ago today my dad died.  I went on a trip to Ohio with my kids to celebrate the end of the school year, and we visited Kings Island for the day.  And I got — my phone rang.  I couldn't hear.  It was my mom.  I couldn't hear anything that she was saying, and as I searched for a quieter place to take the call I got a call from my sister.  And my sister told me my dad had fallen, that he had

1    been taken to the hospital, but that he hadn't made it.  I sat

2    down on the ground in total shock as my little girls surrounded

3    me, and losing my dad has been one of the hardest things I have

4    ever had to face in my life because my dad was my rock.  My

5    parents divorced in the early 1980s when my dad got tired of

6    coming home from work and finding me locked out of the house

7    and decided that my mom's addiction was not going to stop.

8         So it was just me and my dad for a while, and as he

9    told me, we are a team.  And even after my dad got remarried,

10   we were a team.  Even as an adult, we were a team.  When Tony

11   was 19 months old, his father, Anton, went to prison, and Tony

12   stayed with a traumatized and drug-addicted mother in his life,

13   Acacia.  That didn't make his bond with his mom any less real

14   than the bond that I had with my dad.  Acacia was all that Tony

15   had, and Acacia loved Tony.  She still loves Tony.

16        I have spent many hours with Acacia and watched her

17   cry over her son, and when Anton left the picture,

18   dysfunctional and toxic as it was, Acacia and Tony were also a

19   team.  I think it is really important for us today, as we are,

20   like, sifting back through Tony's history and we are looking

21   for guideposts in his life as to how we ended up here today for

22   us to take a minute to realize that Acacia didn't start the

23   dysfunction in this family.  Like so many of the stories that

24   are told in this courthouse, this is a story that involves deep

25   poverty, drug abuse, domestic violence, teen pregnancies, and

childhood neglect and abuse.

Acacia's mom, Amy, lived in a house where she doesn't have any memories of her father ever being sober.  Some of her most vivid memories of her father are of his father laying out drunk in the yard after drinking too much, and that was normal. Amy also lived in a house with a mother that was verbally and physically abusive.  She was choked, punched, and most devastatingly, Amy, she felt like she received no love from her mother.

She was pregnant with Acacia by the time she was 14, and she was desperate to leave her toxic house.  Amy herself, then, became an alcoholic, and Tony's mom, Acacia, also grew up surrounded by drug abuse and domestic violence.  Among the many violent acts that she witnessed when Acacia was seven, she watched as her boyfriend — her mother's boyfriend tried to run her mother over with a truck as she screamed and cried from the porch.

When Amy finally got the strength to leave her abusive partner for a period of time and they went back to live with Amy's parents for a while, Acacia remembers watching her grandmother slam her mother against a wall and choke her.

Repeating a cycle, traumatized Acacia was also pregnant at 15 and desperate to leave her mother's toxic house. When Tony was born, Acacia wanted to protect him from the things that she had suffered.  She wanted better for him, but

she lacked the tools.  Trying to scrape by at that young age
and with Tony in tow, she was arrested for shoplifting, and
that was just going to be her first contact with child
services.

During Tony's childhood, there would be at least 24
cases opened with child services.  With not even a high school
education and making minimum wage, of course, Acacia started to
bounce around from house to house as she couldn't afford the
rent.  Acacia had at least 25 evictions during Tony's
childhood, and they had at least 30 addresses that we could
count.

And most times the houses or the apartments that they
were able to rent were just abysmal.  They had no electricity,
sometimes no gas, sometimes no working utilities at all.  There
were times when they had to use space heaters in the winter to
stay warm.  There was often no food in the fridge, and as
Acacia bounced around between houses, of course, Tony was
bouncing around between schools.  He attended ten schools in
eight years.  He often missed school, he was often tardy.

By the time Tony was seven, Acacia was pregnant again,
and she was, then, living her own life of domestic violence.
Tony routinely witnessed his mom getting beat up by a 6 foot 2,
240-pound Darryl Taylor.  He saw his mom kicked, punched,
thrown to the ground.  He saw his mom beaten when she was
pregnant.  He couldn't —— Tony was tiny.  He couldn't do

anything to help her, but he did try.  Tony used to sit out on the front stoop and keep watch for Darryl and try to warn his mother that he was coming home.  When the fighting — he would also try to help her barricade the door against Darryl when Darryl was angry, but Tony was small.  When the fighting really started, the only thing Tony could do was hide.

Darryl was arrested eight times during their relationship for domestic battery, battery with injury, burglary, theft, intimidation, but Acacia was scared of him and rightly so.  And Acacia never pressed charges.

Adding to what was already a home that was filled with chaos, between the ages of seven and nine, Tony added a new sibling every single year.  Every one of the siblings was positive for drugs, and as the DCS cases opened and closed around those births, Tony was interviewed, and Tony did what his mother told him to do and he stayed silent.  What happens in this house stays in this house, his mother told him.

And as those new babies were coming, Acacia had to work, and Acacia often worked nights.  And Tony was left to care for those babies.  Acacia would leave bottles and diapers on a nightstand for him, and then, Tony would take care of a two year old, a one year old, and an infant.  I am a mother, and I know Your Honor is a mother and I simply cannot imagine that.

I have nine-year-old twins right now.  One of my twins

is a little more responsible.  I can't imagine giving her one
baby to care for, let alone having three babies overnight.  To
put it all in the hands of a little kid like that is
terrifying, but Tony was happy to help his mom.  It is no
surprise that in the pictures that DCS took over the years,
Tony is often holding one of these little baby siblings and
beaming with pride.  He loved his siblings.

       Acacia's relationship with Darryl ended when he was
sent to prison for 12 years for robbery.  Less than a year
later, 27-year-old Acacia began a relationship with 18-year-old
Paris Duncan, who was dating Acacia's teenage sister at the
time.  Paris was also horribly violent, and Paris and Acacia
fought night and day.  Like Darryl, Paris was arrested 14 times
during their relationship, and most of those arrests were for
battery.

       Again, Tony saw his mom routinely beaten.  He saw
Paris break and throw things around their home, and when Tony
was 11, Paris and Acacia exposed him to a shooting.  Paris had
broke into a neighbor's house, and the neighbor came to
confront Paris with a shotgun.  Paris and Acacia threw Tony in
the backseat where he was huddled in the backseat of the car
and took off as bullets were flying.

       That incident finally ended when the police surrounded
their car and pulled everyone out at gunpoint, and 11-year-old
skinny little Tony was pulled out of the car shaking with guns

pointed at him.  There were times that the fighting was so bad that Tony had to call the police.  During one fight Tony was bitten by Paris, that he tried to keep Paris from attacking his mom.

Tony was handcuffed for the first time when the police arrived to arrest Paris, and Paris barricaded himself in the house, trapped the kids up in the bedroom, and was trying to evade the police.  When the police broke down the door Tony was handcuffed and put on the floor, and before Paris surrendered himself, he held up their youngest child, Paris' own child, Tony's youngest sibling, his three-year-old child as a shield.  On top of trying to save Acacia from Paris, Tony was also trying to protect his siblings.  He was also trying to save and protect Acacia from herself.

Acacia — by the time Acacia was with Paris, Acacia was a full-blown alcoholic herself.  She was buying vodka by the gallon.  When Tony was 12 she was pregnant again, and she was still drinking heavily.  And Tony tried to stop Acacia one night.  He was worried about her, and most tellingly, he was worried about his unborn baby sibling.

In response, Acacia shoved him through a glass window on their front porch, cutting the skin and muscle on his arm.  That baby, Tony's fourth sibling, was also born drug positive.

Another night he tried to stop his mother from fighting with a woman on the street.  She had gotten into an

altercation with a neighbor.  He was worried because he knew
that these fights in the neighborhood could easily become
fatal.  So he went outside, and a 15-year-old Tony flung his
mother over his shoulder and carried her, drunk and
belligerent, into the house, only to have her go right back
outside and keep fighting.  That night Acacia was arrested, and
Tony did what Tony has always done.  He took care of the kids.

When Tony was 17, Acacia had her fifth drug positive baby,
and by this point Tony had long been the functioning adult in
this household.  For years at this point he had cooked
breakfast, he had cooked dinners, he had done laundry, cleaned,
given baths, helped with homework.  He did hair.  He packed
snacks.  He got them off to school and daycare.

The siblings described Tony as having been a mother and
father to them.  Over the years there were some moments of
reprieve for Tony.  Tony was able to meet his father's family,
and they welcomed him with open arms.  Tony was sometimes
allowed to spend time at their house, and even though they
lived in Section 8 housing, Tony thought they were rich because
they had bedrooms to themselves.  They had food in their
refrigerator, and their mom took them to do fun activities
sometimes.

And when he was 15, Tony was able to meet his biological
father when he was released from prison, and he was thrilled to
have Anton back in his life.  But he stayed characteristically

silent about the things that were going on at his house.  There
were short periods of time when he lived with his grandmother,
his maternal grandmother, and these breaks did allow Tony to
focus on school and to just take a break from what was going on
in his house.

School and basketball were also a reprieve for him.  From
an early age, from first grade, Tony would sometimes wake up
before his mom in the morning and get himself out of bed and
get himself ready for school.  He did get dressed, brushed his
hair, brushed his teeth, get his breakfast, and be ready to go
because Tony loved school.

School represented a place of normalcy for him and a place
where he didn't have to be afraid, and on the basketball court
was a place where Tony truly excelled.  He was a natural.  He
was very talented.  He used to play in a neighborhood center
where he played three-on-three basketball.  He was so good he
was invited to go to national tournaments.

He played on teams that the schools that he attended, and
as a high schooler at Crispus Attucks, he was being scouted for
college ball.  Tony's teachers and coaches loved him.  He left
a lasting impression on both them and the other students he
went to school with.  He was a laid back and funny kid with an
easy smile, and he was known to be a peacemaker.

Tony didn't like when people were picked on, whether you
were a student or a teacher, and Tony used his status on the

basketball team to help keep the other kids in check.  He
stepped in when he saw teachers or students being picked on.
Unfortunately for Tony, he blew out his knee in his sophomore
year.  He was able to play in his junior year, but by his
senior year he was told that is it.  You have got to stop, or
you are going to face permanent injury.

In the grand scheme of things, those reprieves for Tony
were just not enough.  Tony was resilient, but in the face of
so much chaos, like resilience, you can only get a child so
far.  Ultimately, the driving force in his life was the toxic
relationship with his mother.  Tony could not stay away because
Acacia wouldn't let him.  Acacia wanted him home, and Tony
could not withstand that kind of pressure.

During his senior year, his basketball dreams had been
crushed.  Tony started arriving late to school and missing
school, leaving early, because Acacia wanted him for childcare.
But Tony did it for her.  They were a team, after all, and at
18, Tony became the first one in his family to graduate from
high school.  As Tony was graduating, Acacia found a new way
that she wanted him to protect her.  She wanted him to get a
gun, and Tony did.

After high school, when the basketball dreams were gone and
he didn't have school to focus on, Tony struggled.  All of the
positive and wonderful influences that he came in touch with
through school, his coaches and his teachers and his friends

were gone.  But at 19, Tony found out that he was expecting a
child.  Tony's long-term girlfriend, Nakayla Lee, was pregnant
with their first baby, and Tony really found for himself a new
purpose in fatherhood.

He went to every doctor's appointment.  He catered her
through her pregnancy.  He never left her side during labor,
and having parented already, Tony was prepared for the
challenges of a newborn, and he helped teach Nakayla how to
care for their baby.  And when they had to make a decision
between who was going to go back to work and how they were
going to manage childcare for the baby.  Tony, at that young
age, became a stay-at-home parent, and it was a role that he
loved and took to immediately.

He and ████████ were glued together.  That is what people
told me.  They were glued together.  You always saw them
together.  The stressors at that point on Tony were continuing
to increase.  Tony was already the parent in his mother's
house.  He had also promised to help his Aunt Taylor with her
baby.  She had a little son, and he would help her by
baby-sitting or helping with bills if he could.  And he was
determined to be a father figure for her son.

Tony was the go-to person in his family:  His grandmother,
his mother, his cousins, his aunts, his uncles.  If somebody
had a problem, they were going to go to Tony.  They depended on
him, and he was also a new father himself.  And he was hoping

to move out and start his life with his baby, but in October of
2019 his mother received another eviction notice.  And the only
home they could find that they were able to afford was on Denny
Street, which is another dangerous neighborhood in Indianapolis
where hearing gunshots is like a daily occurrence.

Tony moved his family in in December, and though Tony
wanted at that point to move out and to be with Nakayla and
have his own home with his family, Acacia guilted him into
staying, telling him, "How can you leave me and your siblings
alone here?"  Tony relented.

Three months later in March, the COVID-19 global pandemic
began, and that really was a unique time in history.  Families
were stressed.  Families were facing disruptions in their kids'
education.  I myself had four kids at home all of a sudden for
the foreseeable future.  Families faced disruptions in their
childcare for the same reasons.

Kids weren't eating at school.  Families' budgets were
stretched.  Job losses, being told you needed to work if you
were essential, fears over getting sick.  Many people who have
never suffered from anxiety or depression began to suffer
during that time.  The World Health Organization estimates that
there was a 25 percent increase in anxiety and depression, and
it is at this point we are racing towards April 27th, and
tensions were already high.

The week prior, Acacia had yelled at and threatened Angela

Summers.  On the morning of the 27th, Tony's day started with a phone call from his mom.  Her car had broken down.  She needed to go to Auto Zone to get a battery for her car.  She needed Tony to come pick up two of his siblings.  Tony went.

As soon as he got back home his phone was ringing again. This time he could hear yelling in the background.  Acacia had gotten into a fight with her sister and had been thrown out of the car that they were in.  He needed — she needed Tony to come and get her.  Tony went.

After he got Acacia calmed down and got her back in the car, they went to Acacia's mom's house to see if Acacia's sister had gone there with the battery.  She hadn't, but in that short period of time Acacia got into a fight with her mother, and after he got Acacia back in the car again, Acacia wanted to go over to her cousin Tiffany's.  Tony took her.

Acacia and Tiffany decided that they wanted to have a drink together.  First, they needed Tony to drive them across town to pick up tools to fix the car.  Tony took them.  On the way home, they wanted Tony to take them to the liquor store.  Tony took them.

After Tony got the group dropped off on Denny Street, Tony started trying to sort out the missing battery.  He texted his aunt, asking, "Can I come over?  If I don't bring Acacia, if I don't bring mom with me, can I come over and get the battery?" She agreed.  So Tony went to get the battery.

By now, it is approaching evening, and Tony, in a twist of
fate, arrived home just as Angela Summers was delivering the
mail on the street.  His mother was angry.  She wanted the
mail; and Tony, as he had been doing all day, as he has been
doing for his entire life, stepped in to help, and tragedy
unfolded.

In that moment, when Tony pulled his gun and he shot
Miss Summers, the entire constellation of Tony's past converged
in that moment:  The complex trauma, the posttraumatic stress
disorder that he suffers as a result of the constant violence
and shootings that he had seen had left him in a heightened
alert and hypervigilant state.

In other words, Tony was one step away from fight or flight
at any moment, and that is because trauma lives in our bodies.
Traumatic life experiences, like the ones that Tony had
routinely, leave a physical imprint on us.  And when that
happens, our stress responses can look very different, like,
our responses -- the responses that you and I might have to a
stressful event might look very different than the response
that Tony might have.

And in that heightened state, when Tony was pepper-sprayed,
he was primed at that point to misperceive the threat to
himself.  His underdeveloped 21-year-old brain at the time, his
cognitive impairments in the areas of the brain that help us
make rapid decisions and that help us to control our own

impulses just left him with a lack of ability to understand and
reason through what was happening to him and make an
appropriate response.

Every parent fears the moment when their child's split
decision -- moment when their child's decision that is made in
a split second alters the course of their lives, and that
happened on April 27th everywhere.  With his whole life ahead
in one brief moment, Tony, by taking a life, altered the course
of many lives.

It occurred to me in thinking about this case how deeply
affected Tony and I were by our parental teams; me and my dad
and he and his mom.  I wasn't exposed to chronic violence and
poverty.  I haven't witnessed people be shot in front of me.  I
have never lost anyone in my life due to violence.  I wasn't
forced into the role of parent or protector in my home.   In
many, many ways, I was able to succeed because of the moral
compass of my father.

My entire life, every decision that lay before me, the
right decision was the easy decision.  And for Tony, that was
the total opposite for him.  He grew up in a system that
modeled violence and drug abuse, and every day the right
decision for him was the harder one.  And up until April 27th
of 2020, he was succeeding not because of but in spite of the
moral compass of his mother.  Tony was breaking the
generational cycle all by himself, and I just want to take a

1   moment and consider how truly remarkable that is.  Tony was

2   raised in an environment that made him hypervigilant, but he

3   was also known in his community as a peacemaker.

4       I just think it is remarkable that he overcame himself in a

5   way that many of us — even with the benefits of time, with

6   reflection, with therapy, with being able to sort through our

7   own past, haven't been able to do.  Growing up as deeply on

8   faith as he did, he has still somehow demonstrated resilience

9   his entire life, that innate ability to just bounce back, to

10   adapt, to adopt a positive mind—set despite the things that are

11   happening in our lives.  And he has been doing that his whole

12   life, and he still made a deeply devastating mistake.

13       We all, in our lives, experience successes and failures,

14   but the lives that we lived made us prone to different

15   mistakes.  I have been free my whole life to make small

16   mistakes, even bigger mistakes but carefully guided by a loving

17   parent.

18       For Tony, carrying the trauma that he carries with him, one

19   mistake had the potential to be catastrophic in his life, and

20   it was.  And it was also painfully public.  Tony's biggest

21   failure happened on the national stage.  It was in front of

22   everyone who mattered:  His community, everybody he knows, his

23   family, Indianapolis, the entire nation.  He had to immediately

24   face a reckoning at that moment.  You can't go back.  You can't

25   change it.  You can't unbeat it.  You can't undo it.  There was

1   nothing left for him, and I think in that moment people made a
2   lot of assumptions about Tony.  And I think that is pretty
3   normal, but privately, Tony's community was reeling.

4       This did not match in any way the Tony that they knew.  The
5   Tony that they knew was a goofy and smiling kid.  He was a
6   peacemaker.  He was the kid who didn't run the streets, who
7   didn't get in trouble.  He had never been in trouble a day in
8   his life -- not in school, and not in the community.

9       We spend a lot of time telling our clients that who they
10  are is not defined by their worst act.  That has never felt
11  truer to me than it does in this case.  At the end of the day
12  standing here today, it is difficult to accept that it took
13  disaster for Tony to recognize the patterns in his family and
14  especially with his mom.

15      Tony, as you heard him talk about in his statement, for the
16  first time, has had time to move beyond thinking and planning
17  for essentials and has had some time to try to make sense of
18  his own history.  He spent a lot of time thinking about what
19  happened to Miss Summers and her family and what has happened
20  to him and realizing that he cannot go back to living life the
21  way that he was before.

22      He can't go back to his mom, to being everyone's protector,
23  to jumping whenever anyone needed anything, to ignoring his own
24  needs.  That whole life is gone for him.  When I first met with
25  Tony, that was his goal.  His goal was I am trying.  Whatever

1   happens here, I am trying some day, some how to get back to
2   being that guy again.  Now he has realized that he has to do
3   something new.

4       That piece, although it is alongside deep sorrow and
5   tragedy, it is like being unshackled after 23 years.  And on
6   top of doing the work on his past, Tony has been using his
7   time, as he spoke about, to prepare himself for the hope that
8   he might be home again one day.  He has taken every class he
9   can.  He stayed strongly connected and bonded with his family.

10      He is still providing help and assistance.  He is still
11  talking his siblings through their lives as much as he can.  He
12  is still parenting them, and he stayed very close to Nakayla
13  and his son ▇▇▇▇▇▇ hasn't let this shake his
14  determination, as you heard him talk about, to be there in his
15  son's life and to be the father to baby ▇▇ that he didn't
16  have in his life.

17      So to me, that is just a sign that that resilience is still
18  alive inside Tony, and he has a plan for what he wants to do
19  when he gets to prison.  He wants to explore college.  Lately
20  he has been talking about being interested in counseling.  When
21  he was a kid, he didn't feel like he could speak about what was
22  happening to him, and he is interested in helping other kids
23  who feel like they don't have a voice.

24      He is interested in doing an apprenticeship through the
25  Department of Labor to become an electrician.  He would like to

1    participate in the BRAVE program, which is a cognitive
2    behavioral residential program for young males who are serving
3    their first federal sentence.
4         Now, after considering our submissions and hearing Tony's
5    story, we would ask this Court to impose a below guideline
6    sentence of no more than 220 months or 18 years.  That number
7    represents the mean sentence for second-degree murder that is
8    cited in our memo.  It also represents the average reduction
9    applied to second-degree murders also cited in our memo.
10             THE COURT:  Can I ask you a question about that?  The
11   means and averages cited in your memo, do you have any idea
12   what — you have cited criminal history category but not the
13   offense level.  Do you, do you know what the offense level was
14   or whether there was an enhancement such as was applied in this
15   case?
16             MS. VARNER:  Those were not broken down, not
17   specifically on the sentencing calculator's interactive tool.
18   You could just look for the main guideline that was applied in
19   the case and then enter the criminal history category and get
20   the averages.
21             THE COURT:  Okay.  Thank you.
22             MS. VARNER:  We would suggest to the Court that with
23   no aggravators in this case other than the official victim
24   enhancement, which is already accounted for by the guidelines,
25   it would be well within the Court's discretion to go below that

1    point because this wasn't an aggravated crime.

2         In the case survey that we submitted to the Court, you

3    know, you could really get a sense of the aggravators going on

4    in these cases.  Tony wasn't planning to kill anyone that day,

5    not at all.  He is not a member of a gang or a terrorist

6    organization.  He wasn't in the midst of committing another

7    crime or trying to escape one.  He didn't engage in some sort

8    of prolonged and violent attack.  He didn't hide a body.  He

9    didn't shoot indiscriminately at police officers.

10        A sentence there also, you know, the guideline doesn't

11   take into account the mitigators that are present in this case

12   that aren't accounted for, and I think in this case they are

13   pretty stunning:  Tony's terrible traumatic childhood, his

14   chronic exposure to poverty and violence, his resulting

15   posttraumatic stress disorder, his learning disabilities, his

16   age and underdeveloped brain at the time of the crime, his

17   community support, and his total lack of criminal history.

18        And it takes into account the facts and circumstances

19   that this offense, especially as compared to the facts and

20   circumstances of the other second-degree murders that we cited,

21   when Tony was maced, his hypervigilance, and long history of

22   violence led him to misperceive the danger, and he responded.

23        In closing, I would like to say I personally have

24   spent many, many hours with Tony, and I want everyone in this

25   room, if you leave with one thing, I want you to leave knowing

1    that Tony is filled with regret, regret that he didn't
2    understand things in his life sooner, regret that he never
3    asked for help, regret that he didn't understand how broken he
4    was, regret that he has left Nakayla to parent alone, and he is
5    repeating the generational cycle that he desperately wanted to
6    avoid.

7           His little baby son ███ is growing up without him,
8    but more than anything, Tony is steeped in the regret that
9    someone's life was cut short and that someone is not going home
10   to their child because of his actions.  I am, myself, I am a
11   firm believer that there is medicine in stories and how they
12   resonate with us and how we take them into our own lives.  And
13   I know that there has been medicine in Tony's story for Tony,
14   but beyond that, I hope that there has been some today for
15   Miss Summers' family, for the postal community, and for Tony's
16   family.  Thank you.

17          THE COURT:  Do you want to address at all the Clark
18   County –– Clark County Jail incident?

19          MS. VARNER:  So the Clark County Jail incident, in my
20   estimation, Your Honor, it does look like something was
21   happening in that room.  I think it was a one-off situation.  I
22   think it is difficult to know, and without more information,
23   what Tony's role was there.  And I want to say that I have –– I
24   have visited the Clark County Jail, I am not kidding you, at
25   least 20 times and probably more than that.  And every time I

1   am at the Clark County Jail, somebody there says something to
2   me about Tony that is positive.  He, he is kind.  He is
3   respectful.  He is no problem for us.

4          I have seen someone, a staff member at the jail offer
5   Tony a bite of his sandwich.  I have seen them joke with Tony.
6   I have seen them play, like, a little prank on him, and I, I
7   think that the comments -- I also had someone tell me at the
8   jail, "Tony is respectful and kind, and I wish everyone here
9   was like that."

10         I think we have to be careful not to give that
11  incident too much weight.  Dr. Brams, our trauma expert,
12  posited that Tony is not going to be violent moving forward,
13  that his specific incident was a, a result of the constellation
14  of factors in his background.  And I think that the comments of
15  the people at the jail show that.  Those comments comport
16  exactly with Tony's community's comments about the kind of
17  person that he is.

18         Thank you.

19         THE COURT:  Thank you.

20         Mr. McGrath.

21         MR. McGRATH:  Thank you, Judge.

22         THE COURT:  Mr. McGrath, just before you get started,
23  I wanted to confirm my understanding is that there is no
24  restitution being sought?

25         MR. McGRATH:  That's correct, Judge.

1        THE COURT:  Thank you.

2        MR. McGRATH:  Yes.  Before I begin speaking, I would

3    like to acknowledge a few people that are in the room that have

4    been waiting a long time for this day:  KD, Angela's daughter

5    is present; ███████, former spouse, also mother of KD ──

6        THE COURT:  Right.

7        MR. McGRATH:  ── whose letter I spoke of earlier.  We

8    also have Mr. Crowe, who is Angela Summers' uncle here to show

9    support.

10       THE COURT:  Okay.  Where is Mr. Crowe?  Okay.  Thank

11   you.

12       MR. McGRATH:  Several management members of the United

13   States Postal Service:  Post master of Indianapolis, the

14   district manager for the State of Indiana, and the customer

15   service operator manager.  They are also present in support of

16   the family and interested in the outcome of the case.

17       There are several postal inspectors here, including

18   Case Agent De St Jean that have come to show their support; and

19   from IMPD, Homicide Detective Dustin Keedy, who investigated

20   this case alongside the postal inspectors.

21       At the outset I would like to thank the Court for

22   reviewing all of the information that was thrust upon it sort

23   of at the last minute.

24       THE COURT:  That is my job.

25       MR. McGRATH:  Thanks to counsel for putting together

1   the time and effort to — it took to resolve a case like this,

2   and to present the best that they could for their client today,

3   and in the writings that they did.  This — ultimately, there

4   is no real word to give the most scope as to this case other

5   than tragedy.  This is the ultimate tragedy, tragedy of

6   circumstances, tragedy of the situation, tragedy of issues in

7   the future, going forward, that may never be repaired.

8        But this crime, I think, can best be described — and

9   my argument, I think, can best flow from the 3553(a) factors.

10  I appreciate you reading the United States' memo, Judge, that

11  pouring out of the emotive aspects of a case such as this and

12  weaving in the things about the effects that it has had on the

13  survivors.  But I think that factors themselves give us great

14  guidance on how we can evaluate what the best sentence is in

15  this case.

16       In looking at the first factor, nature and

17  circumstances of the offense and history and characteristics of

18  the offender.  Now, as I stand before you, oftentimes, I kind

19  of jumble all of that into one because it is there in the first

20  section.  It is not really separated by much other than commas,

21  but for this case, I think parsing it all out is extremely

22  important.  And I would like to do that at this time.

23       Looking at the nature of the offense, and as I stated

24  in my memo and here today, as I think everyone would reasonably

25  agree, murder is the ultimate offense.  And it is defined as

1    the unlawful killing of a person with malice aforethought, and
2    a person acts with malice aforethought if the person takes
3    someone else's life deliberately and intentionally or willfully
4    acts with callous disregard for human life, knowing that a
5    serious risk of death or serious bodily harm would result.
6          Now, looking at the submissions by the Defense
7    yesterday and reviewing those cases, cases of which had varying
8    guidelines, unclear offense levels but varying sentences above,
9    below.  All those cases; a lot of them, anyway, seemed
10   extremely harsh.  And while I can concede that Mr. Cushingberry
11   was not committing another crime as he committed this offense,
12   that doesn't take away the heinousness of it, and that should
13   not be specifically recognized as a reason --
14         THE COURT:  Can you hold on for one second?
15         MR. McGRATH:  Oh, yes, Judge.
16         THE COURT:  My computer keeps shutting off, and it is
17   driving me crazy.  We have already had him up here once.  I
18   apologize.  Go ahead.  Fingers crossed.
19         MR. McGRATH:  As I stated, it is the ultimate crime,
20   and accordingly, the most severely punished, and I think there
21   are two reasons for that.  One, you have a life.  I heard Ms.
22   Varner say there is hope in stories.  This is a story that has
23   been terminated.  A story is over.  Only the stories of the
24   past live on, and those only live on as long as memory allows.
25   So those stories have ended, and there is no next chapter.

1   So that theft is extremely considered by others when
2   thinking about how this crime affects our society, but we also
3   look to the lives of others, others such as ███████, KD, who
4   so eloquently -- more eloquently than I could ever do -- put
5   forth in their letters the effect that this loss has had on
6   their life, the time stolen, the health affected, the hearts
7   shattered, the dreams thwarted, things of that nature that,
8   that, that can just never be gotten back, and only time and a
9   significant amount of healing could possibly make any better.
10  So these types of damages occurred, and this is what Tony
11  Cushingberry had wrought with the nature of this offense.

12   And circumstances of the offense, we would not be
13  remiss — be remiss not to discuss this separately.  This
14  occurred in unprecedented circumstances, right when our
15  pandemic was really taking a grip on the country, and essential
16  services, such as the ones Miss Summers had to perform, they
17  had to go on.  They had to be done, and Miss Summers was
18  willing to take the risk to do that, and this was a situation
19  where having now a better understanding of Mr. Cushingberry,
20  knowledge of the situation there, are circumstances that I
21  think maybe in a different time and a different place may not
22  have happened, but they did happen.

23   And they didn't happen for any traditional motive that
24  we might be inclined to look at.  There was no profit.  There
25  was no revenge, not even self-preservation.  It was simply

1  nothing.  It was for nothing, a life vanquished for something
2  so immeasurably trivial as mail delivery.
3      The witnesses detailed that Mr. Cushingberry pursued
4  Miss Summers aggressively over the mail delivery, that he was
5  armed, and when mildly provoked with the dog repellent that I
6  provided the physical facts for to the Court, he made the
7  ultimate decision to end the life of another.  And I think, and
8  this is where I do appreciate what was said here today and also
9  what was put forth in the Defense memo regarding what
10 Miss Summers had posted on her Facebook account, how she had --
11 in case the Court had any questions about her decision to use
12 that dog repellent in that situation, I think now those
13 questions have been answered.
14      It was an acknowledgment that there was intense stress
15 working in that block, specifically to that house under which
16 Miss Summers had been placed.  It wasn't highlighted previously
17 by me because Mr. Cushingberry was not there, and I knew that.
18 I knew he was not present for when Miss Summers was accosted,
19 but it gives you a glimpse into the mindset of how Miss Summers
20 would approach that house.
21      It is highly demonstrative of the abuse and anxiety
22 created in Angela mere days before her death.  It is also
23 indicative of her dedication and willingness to perform a job
24 exposing her to significant risk, not only from COVID, but from
25 the public that she served.  And when she was approached by Mr.

Cushingberry on that day, she was right to be vigilant because of the abuse that she had faced, and the actions that she chose were in defense of herself.  And Mr. Cushingberry, in his hypervigilance, responded with the ultimate decision to end her life.

I think moving on, looking at the history of the Defendant, there is not much else that I can provide to the Court that hasn't been provided in the presentence report and the sentencing materials.  They have done a fantastic job of highlighting who the people closest to Mr. Cushingberry find him to be, what he had overcome, what he was doing with his life, and the effect that his mother had on his thought process.

But in my opinion, after contemplating that and thinking it over for the weekend — over the past three years, really, this sort of thing feeds into characteristics that I think are important for the Court to understand that are especially dangerous.  I have heard him described as a peacemaker several times today.  I read he is a peacemaker who has never known peace, but if we look at this day, his actions were hardly peaceful.  They were provocative, aggressive, and with malice.

He had been described psychologically playing the role of protector for his mother who had been slighted, but he is constantly in this fight-or-flight mode.  Well, in this case he

1  chose fight over flight, and not just fight, he chose to
2  destroy.

3          He was working, as I stated, the role of protector, as
4  I have heard described, for his mother who had been slighted.
5  But these were not the actions of a protector.  These were the
6  actions of an avenger, and perhaps years of futility in
7  watching his mother face abusers whom he could not deter built
8  in him this aggression and willingness to answer the slightest
9  of perceived wrongs.  And particularly in this case, to a
10  weaker target, Miss Summers was not 6 foot 2, 240.  She was
11  five, six, 150 pounds, carrying a mail bag and dog repellent.

12          The Defense has made it clear, that this is
13  essentially an ingrained trait.  So what happens next when the
14  object of his need to protect shifts to someone or someone else
15  and this feeds into the protection of the public?  But I will
16  discuss that in a moment.

17          The need for the sentence imposed to reflect
18  seriousness of the offense, promote respect for the law, and to
19  provide just punishment for the offense.  I know Your Honor and
20  everyone in this room knows the seriousness of the offense.  It
21  doesn't even bear repeating at this point.  It is the most
22  serious of offenses.

23          It is at the highest level, and a punishment
24  commensurate with that offense, as recommended by the
25  Government, strikes the appropriate chord as to what is, in

1     fact, a just punishment.

2         Affording adequate deterrence, perhaps not for Mr.

3   Cushingberry, as I stated in my memo candidly, the deterrence

4   going forward, I think, with a sentence recommended by the

5   Government, it would not have the same effect given the age he

6   would be once released and what I consider to be his sincere

7   remorse today about the events that occurred and his

8   contemplation of those events over the past three years.

9   However, it does afford adequate deterrence to the public.  It

10   shows the public how the Court values human life and how it

11   values its public servants.

12         If we are talking about protecting the public from

13   further crimes of the Defendant, I mean, I already talked about

14   the characteristics and what it took for him inside to do this

15   act, and Your Honor touched on this moments ago with Defense

16   counsel as far as the pending case and the viewing of that

17   video.  I don't know what happened in that room.

18         I could tell, essentially, that Mr. Cushingberry

19   followed three other men that went inside, reemerged at some

20   point, got a trashcan, went inside back into the room, came

21   back out with a full trashcan, and then went back inside.  And

22   then, you could see the victim inmate walking out with a towel.

23   I mean, you can't really see what is going on because the door

24   is closed, but that is another situation -- I appreciate it is

25   not proof beyond a reasonable doubt.  It is something at least

1    for the Court to consider the thought processes that Mr.
2    Cushingberry goes through under stress.

3          Being incarcerated is stressful.  I will not sit here
4    and say that it is not, and being in that setting is different
5    than being on the outside.  But it is still indicative of a
6    pattern of a willingness to do something that is not right in
7    the face of stress, and that is something that the public
8    simply cannot have in society at this time.

9          So a sentence commensurate with the Government's
10   recommendation would serve that particular sentencing need
11   well, and it would give him the time to continue his
12   reflection, his path to redemption, and the things and tools
13   that he needs to go forward with his life because he will have
14   a life after this.  His story is not over.  His child's story
15   is not over.  The love of his life's story is not over.  His
16   family's story is not over like Angela Summers' life is over.

17         There is hope.  There is a chance, but in the
18   meantime, there must be a sentence to justify because all of
19   the other sentencing factors that I have discussed.  In
20   sentencing disparities, I think this is the trickiest one as
21   far as factors go, and I, I will conclude on this.

22         I have looked at the statistics provided by the
23   Defense counsel, have read the submissions.  I have tried to
24   look up some Sentencing Commission's statistics as well for
25   this district, as well as the Seventh Circuit, basically.

1    There is simply not a lot of data there to go off of as far as
2    sentencing trends go, particularly in the Southern District of
3    Indiana where I don't believe there were any sentences of any
4    meaningful -- or at least not reported in the Sentencing
5    Commission in those stats.

6          So I will just -- generally speaking about this place
7    where we live and this place where Angela served and this
8    state, and if convicted of a similar crime for someone that was
9    not working as a federal employee and it wasn't on account of
10   his or her duties, Mr. Cushingberry would be facing 45 to 65
11   years in a state court and Detective Keedy can attest to that
12   as well.  He has investigated many cases that don't make it
13   here.  No cases make it here.

14         This is a crime strictly because of who Angela was,
15   her job, and what she did.  And anywhere else in the state,
16   anywhere else down the street, in the new Community Justice
17   Center, Mr. Cushingberry would be facing significant more
18   sentence of mandatory minimums; and here, Your Honor, you have
19   the broadest discretion in sentencing.  The term -- any term of
20   years or life is how the statute reads for second-degree
21   murder.  That is all or nothing.  That, that is the ultimate
22   discretion that the Court has, and I just wanted to highlight
23   for Your Honor.  And I know your time as state judge you have
24   sentenced cases like this before.  I don't know if I have ever
25   worked on something more tragic than this, especially from my

1    time there.

2          But essentially, there is a disparity in the treatment

3    of these types of cases in this state, and I think between that

4    and the Federal Government.  And I think the Government's

5    recommendation balances that.  It takes into consideration the

6    mitigation that has been offered, and it takes into

7    consideration all of the other sentencing factors:  The just

8    punishment, the seriousness of the offense, and the most, I

9    guess, I guess the most just way to end this and for everyone

10    to try and move forward and begin to heal as best they can.

11    Thank you.

12          THE COURT:  Thank you, Mr. McGrath.

13          So let me say first to ████████ and KD, that you

14    have the Court's extreme sympathy.  You have both made very

15    eloquent statements to the Court that I have carefully

16    considered, and I want you to be mindful of that.

17          I also want to thank the individuals who participated

18    in the video and supported Mr. Cushingberry, who gave me their

19    insights into their experience with him and probably,

20    particularly Nakayla, I think you are going to be — you are

21    probably, but you are a terrific person and a terrific mom and

22    he was very lucky.  He is very lucky to have you in his life.

23    You have a spark that is, that is very, very impressive, and I

24    am sorry for you that you are going to have to raise your baby

25    alone.  But as Mr. Cushingberry noted, and I tell people this

1   all the time.  You can be a dad from prison.  It is not easy,
2   but you can be a dad from prison.  Many, many people don't even
3   put forth the effort, but I have faith that you will.

4            So let me go through the factors that are listed in
5   the federal sentencing statute.  To impose a sentence that is
6   sufficient, but not greater than necessary, which is what
7   ultimately the law requires.  So the first is the nature and
8   circumstances of the offense, and the Government used the word
9   "tragedy."  I will use the word "senseless tragedy" because
10  that is what this was, a senseless tragedy; senseless in a
11  whole host of ways.  First of all, the extreme overreaction,
12  the hypervigilance that has been acknowledged, the
13  confrontation that was unnecessary when there was information
14  about how this problem could have been solved in a peaceful
15  way.

16           It is not on you, Mr. Cushingberry, why it wasn't,
17  except for the ultimate thing that happened at the end, but
18  murder is the most serious crime.  And the reason it is is
19  because of the holes that it leaves in people's lives, and we
20  have heard a lot about some holes that you have in your life
21  because of your upbringing.  And there is therapy, and there is
22  ways for you to get help, but there is a gaping hole that is
23  now left in this child's life here.  She has got great support
24  and another mom who loves her, but the senselessness of what
25  has happened will be difficult for her to get her head around

1    and just the overreaction in terms of the nature and
2    circumstances of the offense.

3        I reread the complaint this morning and the affidavit,
4    and you told the officers you were 6 feet from her.  That would
5    be about, about me and my courtroom deputy here when you shot
6    her.  It is right there.  She was just right there in front of
7    you, and that makes it really frightening to me.

8        Your history and characteristics are utterly — talk
9    about tragedy, utterly tragic.  It is not lost on me that your
10   mother has now left the courtroom.  You did an amazing job
11   living through all of that trauma and all of that violence and
12   all of that responsibility, an amazing job, and you exhibited
13   it in school and the way your teachers and your coaches and
14   your classmates saw how you overcame everything.  But there, as
15   your lawyer described it, there is a toxicity with your
16   relationship with your mom.  And it causes you to behave in
17   ways you don't otherwise, and I think the Government made a
18   good point in drawing the line between protector and avenger.

19       And that was a very wrongheaded decision that you made
20   on that day, but the mitigation evidence is significant.  You
21   aren't the most damaged, hurt, wounded child I have seen, but
22   you are close.  You are close.  There is no doubt about it, and
23   so you do — the Court finds in mitigation complex trauma,
24   PTSD.

25       Your youth is not necessarily considered except for

1   the fact that I know that you do not have a fully developed
2   brain.  It has been developing over the past three years, and
3   you have a couple more years, probably a couple more than that
4   above the average because of everything that you went through
5   as a child.  You have shown an incredible capacity to love in
6   your life, which is pretty remarkable, but I can't help but
7   think about your history and characteristics.

8           The statements -- I think the Dalai Lama made the
9   statement about ripples.  You know, you did something that has
10  made a ripple, and it has caused a ripple of pain and loss and
11  heartache and not just in your family, who are here and
12  devastated, I am sure, but for this family that has lost their
13  person.  And your family can still have contact with you.  They
14  cannot, and that ripple is really significant because it is not
15  fair for trauma to be given away from you to KD.

16          Now, she is traumatized.  Now, she is experiencing
17  PTSD from losing her mom, and it is very, as you know, it is
18  very consequential.  It isn't as repetitive as what you had to
19  go through.  It isn't as violent as what you had to go through
20  in your life, but it is very real.  And I just talked about
21  that in the context of your history and characteristics, and I
22  really should talk about it as I did in the nature and
23  circumstances of the crime where the law allows me to consider
24  the impact on the victims.  And I note that both of them were
25  gracious in not asking for what people often do in terms of

1    retribution.  They were gracious, and many of the people who

2    wrote letters for you asked me to give grace, give grace to

3    you.  So it is something I am thinking about.

4         But I have to consider about a just punishment.  That

5    is ultimately what everybody in the law hopes for is a just

6    punishment, and I have to think about, then, two things:  The

7    harshness of the crime and your reaction in these

8    circumstances, the impact it had on the victims.  And those two

9    things in terms of a just punishment weigh heavily on me.

10        So I need to make sure that you are punished.  That is

11   going to happen one way or the other.  There was only slight

12   provocation in this case, though.  Yes, she sprayed the mace.

13   I don't know why you brought the gun over there, maybe you

14   always carried it, it was lawful for you to have it.  That is

15   not the point, but it was just such a huge overreaction.

16        So I am looking at some of the things that the statute

17   also requires.  So the seriousness of the offense I have talked

18   about.  Respect for the law, I very much appreciated at the end

19   of your statement you are apologizing for your flight because

20   you did flee after this happened, and you said, "I should have

21   stuck around" and you should have stuck around.  But once

22   confronted by law enforcement and after your lawyer arrived,

23   you did confess, and so that is a pretty quick showing of

24   respect for the law.

25        Deterrence is a tricky aspect in your case.  Specific

1    deterrence means what can I do to make sure you don't hurt
2    anybody else; and then, there is general deterrence.  And that
3    is where my consideration of what -- everybody from the postal
4    community said to me.  All these people are trying to do is
5    bring mail, and when they get confronted by people who refuse
6    to put up dogs or who give them attitudes or give them a hard
7    time, they are not allowed to carry a firearm.

8            They get the — they get the mace, if I read the
9    letters correctly.  That is all they get is the dog repellent
10   because I am sure their employers don't want them being
11   involved in situations with guns, but especially during April
12   of 2020 when none of us knew if we were going to live or die.
13   And they had to go to work every day, and for them to be
14   confronted and the fear that they had, that is why this case
15   got national attention is because these folks had no choice.

16           They had to leave their job or go to work, one or the
17   other; and now, the place where Miss Summers worked is a place
18   where nobody wants to work because it is considered too
19   dangerous.  So deterrence, general deterrence does apply in
20   your case.  I am usually not a big fan of general deterrence,
21   but I do need to make sure that the sentence in your case says
22   to other people, in essence, don't mess with the mailman or the
23   mailwoman.  Just let them do their job and be on their way.

24           To protect the public from further crimes of the
25   Defendant, here is the other complicated part about your case.

1    Everything your lawyer says is true about the trauma and the
2    violence that you experienced and its impact on yourself and
3    your brain and your hypervigilance, but how do I know when --
4    if something like this isn't going to happen?  And I need to
5    make sure that you have time to grow up some and put all of
6    this in the very distant past because that is of concern to me.

7         I will talk about Clark County because I saw it.  I
8    don't see any evidence on that that you struck that other
9    person, but I am pretty sure it was you, as the Government
10   said, who got the trashcan, then, came out and got a bag for
11   the trashcan and then, filled the bag in the trashcan and who
12   looks like, to me, was standing up the door holding up the
13   towel so we couldn't see what was going on in there.  Whether
14   you beat that other guy or not, that is not a reactive
15   situation to me.  That is a more thoughtful situation because
16   there were 15, 16 other guys just kind of milling about.

17        One guy opened the door, whoa, closed the door, backed
18   off of the situation, wouldn't go in there.  So that concerns
19   me, and I recognize what your lawyer says and recognize the
20   good progress that you have shown with the classes that you
21   have submitted.  And they have kept you there so they haven't
22   asked the marshal to move you so that is probably a sign they
23   think that you are respectful and okay, but I really wish that
24   hadn't happened because it makes me wonder about your thought
25   process.

1    There are programs that we can help you in.  I am glad
2    you suggested the BRAVE program.  I think it would be an
3    appropriate program for him, given his age.  There will be
4    others, but there is all kinds of training and educational
5    programming that you can participate in with your diploma,
6    especially you should be able to get into higher education
7    classes while you are there.

8    I want to talk about disparity.  I am not satisfied of
9    the, the specificity of the, of the guidelines information
10   because I don't know where the people started to know where
11   they ended up on the guideline range, and so.  And then, on the
12   flip side of that, I looked up the Government's request for me
13   to consider disparity vis-a-vis state sentences.  The Circuit
14   is very clear that that is an inappropriate use of that
15   sentencing factor.

16   It is to avoid —— the goal of 18 U.S.C. 3553(a)(6) is
17   to avoid unwarranted sentencing disparities among italicized
18   federal defendants, and that is *United States v. Schmitt*, 495
19   F.3d 860 —— well, it is *United States v. Williams*, citing
20   *United States v. Schmitt*.  And the *United States v. Williams*
21   case is a 2022 case.

22   So I am not going to aggravate the sentence or vary
23   upward because of the sentencing disparity.  The choice to file
24   here was the choice to file here so this is the scheme that we
25   are going to have, but I am also not inclined to vary below the

guidelines because I believe that with respect to the nature
and circumstances of the offense, the impact on the victims,
and the senselessness of this crime, the guidelines account
for — the guidelines don't necessarily account for everything.
But the way, what I consider there to be some aggravating
factors in this case, which was the absolute senselessness of
what happened and the risk that Miss Summers was under because
of COVID, that is somewhat aggravating.

And I think the impact on the victim, which the
Circuit also says can be relied upon to vary upward, is
aggravating.  But I am not going to use it to vary upward.  I
am going to use all that to say I think it balances out, and a
guideline sentence is appropriate.

Angela Summers was 45 years old on the day that she
died, almost 46, and her life expectancy for the State of
Indiana — I did, taking judicial notice of the federal life
expectancy tables — is 75.  And the Court concludes that a
sentence of 360 months, which is within the guidelines, is an
appropriate sentence in this case.  That is 30 years, Mr.
Cushingberry, which I believe is an appropriate measure of the
loss and harm inflicted in this case.  So I will go ahead and
state the proposed sentence at this time.

Pursuant to the Sentencing Reform Act of 1984, it is
the judgment of the Court that the Defendant, Tony
Cushingberry, also known as Tony Cushingberry-Mays, is hereby

1 committed to the custody of the Bureau of Prisons to be
2 imprisoned for a term of 360 months for the reasons just
3 stated.

4       The Court will recommend participation in the BRAVE
5 program, mental health treatment, including treatment for
6 trauma, substance abuse treatment, including RDAP, cognitive
7 behavioral training, vocational training, including CDL, higher
8 education classes.  The Court will also recommend, although I
9 am not sure what the nature of the crime this will be honored,
10 but I will recommend placement in a medium security facility.

11      The Court notes the Defendant -- there is no request
12 for restitution in the case.

13      The Court will also order that a fine of $1,000 be
14 paid.  The Court is ordering that fine in order to account for
15 additional punishment within the guidelines and also to assist
16 Mr. Cushingberry in getting a job.  The Defendant shall --
17 while in prison.

18      The Defendant shall forfeit a Glock, Model 19 Gen 5,
19 9-millimeter Luger caliber semiautomatic pistol bearing Serial
20 No. BGUK332 and any ammunition.

21      Supervised release is not required by statute, but the
22 Court is imposing a three-year term of supervised release
23 following Mr. Cushingberry's release from prison setting forth
24 or incorporating, by reference, those conditions set forth in
25 Paragraph 63 and 64 of the presentence investigation report.

1          The Court is also ordering the Defendant to pay the

2     mandatory special assessment of $100.  Payment of the fine and

3     restitution are due immediately and are to be made directly to

4     the clerk of the United States District Court.

5          Counsel, do you have any legal objection to the

6     sentence that I have proposed, or do you require any further

7     elaboration of my reasons under Section 3553(a), Mr. McGrath?

8          MR. McGRATH:  No, Your Honor.

9          THE COURT:  Ms. Varner?

10         MS. VARNER:  No, Your Honor.

11         THE COURT:  Is there any recommendation as to a

12    placement location?

13         MS. VARNER:  Your Honor, if Your Honor is recommending

14    that he may go to a medium facility, FCI Greenville.

15         THE COURT:  Okay.  The Court will recommend FCI

16    Greenville, and with that addition — do they have BRAVE there?

17         MS. VARNER:  They do.

18         THE COURT:  Okay, great.

19         All right.  The Court will order the sentence imposed

20    as stated.

21         Mr. Cushingberry, you can appeal your conviction if

22    you believe that your guilty plea was somehow unlawful or

23    involuntary or if there is some other fundamental problem in

24    the proceedings that was not waived by your guilty plea; do you

25    understand?

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  All right.

3        Normally you would have the right to appeal your

4   sentence.  However, you can give up that right as part of a

5   plea agreement, and you have entered into a plea agreement

6   which contains a waiver of your right to appeal.  Do you

7   remember us talking about that?

8        THE DEFENDANT:  Yes, ma'am.

9        THE COURT:  Okay.  That waiver is generally

10  enforceable, but if you believe it is not valid, you can

11  present that theory to the Court of Appeals; do you understand?

12       THE DEFENDANT:  Yes, ma'am.

13       THE COURT:  To begin an appeal you must file a notice

14  of appeal within 14 days of the entry of judgment.  Upon

15  request, the clerk of court can prepare and file a notice of

16  appeal.  If you cannot afford the filing fee or cannot afford

17  to pay a lawyer to appeal for you, the Court will appoint a

18  lawyer to represent you on appeal.  Do you have any questions

19  about your appellate rights, your appellate waiver, or the time

20  limit for filing a notice of appeal?

21       THE DEFENDANT:  No, ma'am.

22       THE COURT:  All right.

23       Mr. McGrath, the remaining count?

24       MR. McGRATH:  Yes, Judge.  We move to dismiss Count

25  II.

1          THE COURT:  Count II.  Any objection, Ms. Varner?

2          MS. VARNER:  No, Your Honor.

3          THE COURT:  Count II is dismissed.

4          Is there anything further for the Government?

5          MR. McGRATH:  No, Your Honor.

6          THE COURT:  For the Defense?

7          MS. VARNER:  No, Your Honor.

8          THE COURT:  The Court orders the Defendant remanded to

9     the custody of the United States Marshal.  Good luck to you,

10    Mr. Cushingberry.

11         THE CLERK:  All rise.

12         (Concluded, 2:32 p.m.)

13                          - - -

14              CERTIFICATE OF COURT REPORTER

15

16         I certify that the foregoing is a true and correct

17    copy of the transcript originally filed with the clerk of court

18    on July 11, 2023, and incorporating redactions of personal

19    identifiers requested by the following attorneys of record:

20    Jayson W. McGrath, in accordance with Rule 49.1 of the Federal

21    Rules of Criminal Procedure and Southern District of Indiana

22    Rule 80-2.

23         Redacted characters appear as a black box in the

24    transcript.

25

S/s Jean A. Knepley                October 12, 2023
Signature of Approved Transcriber   Date